**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROBERTA FERARO-BENGLE, | ) | |
| | ) | Civil Action No.: 03-cv-1650 (JLL) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | **OPINION** |
| RANDSTAD NORTH AMERICA, L.P., | ) | |
| ROBIN CURRAN, JANE OR JOHN | ) | |
| DOES, 1-50, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**LINARES**, District Judge.

Plaintiff Roberta Feraro-Bengle commenced this action against her former employer, Defendant Randstad General Partner U.S., L.L.C.[1] ("Randstad"), alleging, inter alia, age discrimination and retaliation in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq. ("NJLAD"). Randstad and one of its supervisory employees, Robin Curran ("Curran"), have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. This motion is resolved without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure.

### FACTUAL AND PROCEDURAL BACKGROUND

Randstad is a staffing company, engaged in the business of providing workers to client companies for temporary assignments. Randstad maintains offices throughout the United States.

---

[1]Incorrectly pleaded as Randstad North America, L.P.

Randstad branches are staffed with Agents and Managers.  Agents are responsible for selling staffing services to potential and existing clients.  Randstad also employs Business Development Managers ("BDM"), who are responsible for establishing accounts for staffing services with new client companies.  BDMs are under the direct supervision of Market Managers, who supervise all the employees of several branch locations.

Plaintiff is a former employee of Defendant Randstad.  Plaintiff commenced her employment with Randstad's predecessor company, Dial-A-Temp, in 1992.  Between 1992 and 2000, Plaintiff held numerous positions with Randstad.  In June of 2000, Plaintiff was transferred to the BDM position as a consequence of a company-wide reorganization.  Plaintiff was now responsible for generating new business by marketing and selling Randstad's staffing services to potential clients.  From approximately June 2000 to September 2000, and again from April 2001 to May 2001, Plaintiff was supervised by Market Manager Brian Collins ("Collins").  In May 2001, Defendant Robin Curran ("Curran") became Plaintiff's supervisor upon being hired as the Market Manager, overseeing the Piscataway, New Jersey branch office where Plaintiff worked.  Curran met with Collins to discuss the performance of the employees who would now be reporting to her, including Plaintiff.  He advised Curran that Plaintiff "needed closer supervision."  (Brown Cert. Ex. C, Collins Dep. T:28, Dec. 15, 2003).

Thereafter, Curran began receiving complaints from some of Plaintiff's coworkers about Plaintiff's attitude and behavior in the workplace.  (Id. Ex. B, Curran Dep. T:20-21, 24, Dec. 15, 2003).  Curran found that Plaintiff's behavior "was beginning to become progressively worse." (Curran Dep. T:26).  Therefore, on June 18, 2002, Curran counseled Plaintiff concerning Plaintiff's "self control" issues, including allegedly raising her voice and throwing papers at other employees.  (Id. T:22, 28).  On June 20, 2002, Curran met with Plaintiff regarding

complaints from co-workers that Plaintiff was allegedly listing herself as a business contact for other employees' clients, improperly.  (Id. T:28).  As Curran explains, the purpose of the meeting was to "clarify for [Plantiff] exactly was acceptable, [and] not acceptable for her attaching her name as to clients."  (Id.).  Plaintiff maintains, however, that she told Curran that other agents were putting Plaintiff's name on her accounts.  In August 2002, Curran performed an internal audit, and allegedly finds that Plaintiff "attached her name, once again, to contracts and companies" although she "was not the person who did the sales activity with or gained those contacts and clients."  (Id. T:63).  Curran notes: "I brought it to [Plaintiff's] attention that I was finding again [that] she was doing what she had been counseled prior not to do."  (Id.).

In October 2002, Curran accompanied Plaintiff to a sales meeting with a prospective client.  According to Defendants, BDMs are expected to perform research on the prospective client prior to a sales meeting, in order to ascertain whether Randstad's services may suitable for that client.  On October 10, 2002, Plaintiff and Curran conducted the sales meeting with the prospective client and discovered that the prospect sought staffing services which Randstad did not provide.  Defendants contend that when questioned by Curran about her preparation for the meeting, Plaintiff admitted that she was not prepared.  (Curran Dep. T:70).  However, Plaintiff denies that was not prepared for the meeting.  (Pl.'s Reply to Def.'s Stat. of Facts, ¶ 9).

In October 2002, Randstad experienced another company-wide reorganization, which included the elimination of the BDM positions and the transfer of numerous BDMs to Agent positions.  Plaintiff was transferred to an Agent position during this period.  As a result of the transfer, Plaintiff lost the use of her private office and was moved to a common area with the other Agents.  Unlike BDMs, all Agents worked from desks in common areas of branch offices.

In October of 2002, Curran also received a report from Market Manager Anthony

Castellucci ("Castellucci") that Plaintiff made an alleged discriminatory comment concerning an

African-American employee in Randstad's corporate headquarters in Atlanta, Georgia.  (Curran

Dep. T:73-74).  According to Castellucci, Plaintiff allegedly told him that the employee from

corporate headquarters should "be back in the cotton fields" or "should be picking cotton."

(Brown Cert. Ex. D, Castellucci Dep. T:36, Dec. 12, 2003).  Plaintiff disputes this assertion, and

maintains that she said that the Randstad employee on the other line "must have had cotton in

her ears because she couldn't hear what I was saying."  (Panitch Cert. Ex. I., Bengle Dep. T:45,

Dec. 4, 2003).  Castellucci expressed his concern to Curran that the alleged comments were

inappropriate.  (Curran Dep. T:73-74).  No investigation of the matter took place.  Curran did,

however, make reference to this matter in the October 18, 2002 Annual Performance Review,

noting: "Most recently an inappropriate statement was brought to my attention by another

Market Manager, Roberta made an inappropriate statement that should not have been made in

the work place."  (Brown Cert. Ex. A, Pl.'s Dep. Ex. 4).

Plaintiff received a poor appraisal in virtually all aspects of the October 18, 2002 Annual

Performance Review.  As described above, Curran commented on the alleged inappropriate

statement made by Plaintiff to Castelluci.  Curran further notes, for instance, that Plaintiff

"handles herself in my opinion very unprofessionally, many times with outbursts and making

inappropriate statements to her co-workers" and that Plaintiff "will set goals but fails to meet

objectives."  (Brown Cert. Ex. A, Pl.'s Dep. Ex. 4).  Curran also comments that Plaintiff's

"behaviour has created an environment where the trust amongst the team is no longer as strong

as it should be."  (Id. Ex. 4).  In addition to the negative review, Plaintiff was also placed on a

performance improvement plan known as the "Back On Track Plan."  It established performance

goals for Plaintiff over an eight-week period.  Specific reasons cited for placement on the "Back

On Track Plan" included: a failure to meet performance expectations as a BDM, "negative

behavior," as well as "negative" and "inappropriate" comments in the workplace.  (Id., Pl.'s

Dep. Ex. 5).

In the October 18 performance evaluation, Curran also states: "Roberta is a very tenured

staff member with a lot of staffing industry experience.  Roberta could be an asset if she would

be willing to mentor her co-workers and interact with greater flexibility."  (Brown Cert. Ex. A,

Pl.'s Dep. Ex. 4).  Curran further notes: "My perception is Roberts feels that with all her years of

experience, she doesn't need to plan as much and that has hindered her ability to work

strategically."  (Id.).  On October 22, 2002, Plaintiff sent an email to Randstad's human

resources department, claiming that she had been subjected to a hostile work environment based

on the above comments by Curran.  (Defs.' Resp. to Pl.'s Counterstatement ¶ 7).  In response,

Jennifer Wood ("Wood"), from Randstad's human resources department, contacted Plaintiff on

October 28, 2002, to discuss the harassment allegations.  Plaintiff expressed her dissatisfaction

with Curran's October 18 performance evaluation.  Based on her conversation with Plaintiff,

Wood understood that Plaintiff had conceded that Curran had not made ageist remarks to

Plaintiff.  Wood states: "When talking to [Plaintiff], her conversation was such that she

ultimately said that her performance was not what it should be, and that all said and done, maybe

she wasn't being discriminated against, maybe she was just having a hard time with Robin

[Curran]."  (Brown Cert. Ex. E, Wood Dep. T:34, Dec. 11, 2003).  Wood's notes from the

meeting appear to reflect this understanding, providing as follows: "I asked [Plaintiff] if she

could help me understand if maybe something had been said that was direct – or implied – that

[referred] to her age – she then said no – she just thinks that Robin [Curran] doesn't like her ...."

(Brown Cert. Ex. A, Pl.'s Dep. Ex. 7).  Based on the foregoing, Defendants believed that the issue had been resolved.

In addition to Plaintiff's allegations relating to Curran's statements in the performance review, Plaintiff further contends that two years before Curran became Market Manager, another manager told Plaintiff that Randstad was trying to "get rid of the old guard," and that another unidentified market manager referred to her as the "old bat."  (Compl. ¶ 9).  Plaintiff, however, did not communicate these comments to anyone in the company.

Beginning on or about November 1, 2002, Plaintiff stopped reporting to work.  Each day, Plaintiff left Curran a voice mail stating that she was sick.  (Panitch Cert. Ex. I, Pl.'s Dep. T:75).  Stacey Williams ("Williams"), a member of Randstad's human resources department, contacted Plaintiff numerous times to obtain the necessary medical documentation explaining the basis for Plaintiff's absence, as required under Randstad's attendance policy.  By letter dated November 27, 2002, Plaintiff, through counsel, informed Randstad that she was resigning her employment.  (Brown Cert. Ex. A, Pl.'s Dep. Ex. 9).

Plaintiff commenced the instant action on February 24, 2003, in the Superior Court of New Jersey, Law Division, Middlesex County.  Defendants removed the case to this Court on April 11, 2003.  In her Complaint, Plaintiff alleges hostile work environment, retaliation, and aiding and abetting, all in violation of the NJLAD, as well as intentional infliction of emotional distress and negligent infliction of emotion distress.[2]

Defendants presently move for summary judgment against Plaintiff on all remaining claims of Plaintiff's Complaint.

---

[2]Plaintiff voluntarily dismisses the claims for intentional infliction of emotional distress and negligent infliction of emotional distress.  (Pl.'s Br. in Opp. 16).

## LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).  "A 'genuine' issue is one where a reasonable jury, based on the evidence presented, could hold in the movant's favor with regard to that issue."  Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 129 (3d Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).  When considering a motion for summary judgment, all evidence must be reviewed and all inferences drawn therefrom must be in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the moving party files a properly supported motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 256.  "The mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."  Id. at 252.  Furthermore, conclusory statements and arguments do not raise triable issues which preclude summary judgment.  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 252 (3d Cir. 1999).  Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson, 477 U.S. at 257 (citation omitted).  If the opponent fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted.  Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986).

**DISCUSSION**

**A.      Hostile Work Environment Under the NJLAD**

Plaintiff alleges that she was subjected to a hostile work environment in violation of the

NJLAD . (Compl. ¶¶ 19-25).  The NJLAD provides, in relevant part: "It shall be an unlawful

employment practice, or ... unlawful discrimination ... for an employer, because of the ... age ...

of any individual ... To discriminate against such individual in compensation or in terms,

condition, or privileges of employment ...."  N.J.S.A. 10:5-12(a).  A plaintiff alleging a hostile

work environment based on age must establish that the defendant's conduct (1) would not have

occurred but for the person's age, and the conduct was (2) severe or pervasive enough to make a

(3) reasonable age-protected employee believe that (4) the conditions of employment are altered

and the working environment is hostile or abusive.  Caver v. City of Trenton, 420 F.3d 243,

262-63 (3d Cir. 2005) (citing Taylor v. Metzger, 706 A.2d 685, 688-89 (N.J. 1998));  Shepherd

v. Hunterdon Dev. Ctr., 803 A.2d 611, 625 (N.J. 2002); Kelly v. Bally's Grand, Inc., 285 N.J.

Super. 422, 434 (App. Div. 1995).[3]  In assessing a hostile work environment claim, courts should

consider the "totality of the circumstances."  Andrews v. City of Philadelphia, 895 F.2d 1469,

1482 (3d Cir. 1990).  Accordingly, "a discrimination analysis must concentrate not on individual

incidents, but on the overall scenario."  Id. at 1484; see also Taylor, 706 A.2d at 692 ("Severity

and workplace hostility are measured by surrounding circumstances.").  As a general matter,

offhanded comments and isolated incidents are insufficient to sustain a hostile work environment

claim.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), quoted in Heitzman v.

---

[3]In this Circuit, courts utilize a similar analysis for discrimination claims under Title VII of the
Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., and the NJLAD. Abramson
v. William Paterson College of New Jersey, 260 F.3d 265, 277 n. 7 (3d Cir. 2001) (noting that
"any plaintiff who has fulfilled a Title VII prima facie case will have also shown the elements
required by the NJLAD."); Cortes v. Univ. of Med. & Dentistry of New Jersey, 391 F. Supp. 2d
298, 311 (D.N.J. 2005).

Monmouth County, 321 N.J. Super. 133, 147 (1999).  Instead, the "conduct must be extreme to amount to a change in the terms and conditions of employment ...."  Faragher, 524 U.S. at 788. Further, in evaluating a hostile work environment claim, courts may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

### 1.      Discrimination Because of Age

In support of her hostile work environment claim, Plaintiff contends that the following actions – allegedly ageist comments by various individuals employed with Defendant, Plaintiff's October 2002 negative performance evaluation, placement on the "Back on Track Plan," Plaintiff's transfer from an office to a common area, and Plaintiff's treatment after she stopped going to work on November 1, 2002  – were all connected to Plaintiff's age.  In evaluating Plaintiff's allegations, the Court is mindful that in order to prove that an employee's age caused the conduct alleged to have created a hostile work environment, the employee must demonstrate more than just "offensive" conduct on behalf of the employer.  Harris, 510 U.S. at 23. Moreover, speculations, generalities, and gut feelings, however genuine, do not permit an inference of discrimination to be drawn.  Chambers v. Heidelberg USA, Inc., No. 04-583, 2006 WL 1281308, *6 (D.N.J. May 5, 2006) (citation omitted).

First, Plaintiff points to alleged statements made by an unidentified person to a former manager, Ian Roberts ("Roberts"), describing Plaintiff as "old bat," and allegedly stating that the company wanted to get rid of the "old guard."  (Pl.'s Counterstatement of Facts ¶ 7).  No testimony of any individual alleged to have made or heard these comments has been offered. The statements allegedly made to Roberts, therefore, cannot form the basis of a hostile work

environment claim because Plaintiff fails to submit any admissible evidence to support it.

Fiorglio v. City of Atlantic City, 996 F. Supp. 379, 385 (D.N.J. 1998) ("[E]vidence that can be considered by a court under Rule 56 is normally of the same quality of evidence that a fact finder may consider at trial.").  Plaintiff admits that she did not hear the aforementioned remarks firsthand, but rather, that she was "advised by her former manager, Ian Roberts, that the term 'old bat' had been used to describe her" and further that "the company wanted to get rid of the 'old guard.'"  (Pl.'s Counterstatement of Facts ¶ 7).  Plaintiff fails to identify the person or persons alleged to have made the statements, however, and offers no evidence from Roberts or affidavits, testimony or certification from any other individual, concerning the alleged statements.  These statements, without more, constitute hearsay and are not admissible.  See e.g., Philbin v. Trans Union Corp., 101 F.3d 957, 961 (3d Cir. 1996) (noting that statements by unknown individuals constitute hearsay and could not be considered at summary judgment).  Therefore, even viewing the facts most favorably to Plaintiff, the Court cannot consider the hearsay statements.[4]

Next, Plaintiff contends that some of the statements made by Curran in the October 18, 2002 performance review were ageist.  Plaintiff specifically points to the following comments by Curran: "My perception is that [Plaintiff] feels that with all her years of experience, she doesn't

---

[4]Ignoring the inherent hearsay problem with the alleged "old bat" and "old guard" statements, Defendants are still entitled to summary judgment with respect to these comments.  Plaintiff's claim would still be dismissed as it pertains to this these statements, since Defendants have met the affirmative defense standard outlined by the Supreme Court in Faragher, 524 U.S. at 807 (holding that "[t]he [affirmative] defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."); see also Burlington Indus. v. Ellerth, 524 U.S. 742 (1998).  Plaintiff did not communicate these comments to anyone in the company.  Accordingly, Plaintiff could nonetheless, not rely on these alleged statements in support of a hostile work environment claim.

need to plan as much," and "Plaintiff is a very tenured staff member with lots of staffing industry experience."   (Brown Cert. Ex. A, Pl.'s Dep. Ex. 4).  These comments do not constitute direct evidence age discrimination.  The comments cannot fairly be deemed by a reasonable fact-finder to be gender-based because they clearly relate to Plaintiff's experience working for Defendant. "[C]omments that do not relate to age on their face cannot by their very nature constitute direct evidence of age discrimination."  Sosky v. Intern. Mill Serv., No. 94-2833, 1996 U.S. Dist. LEXIS 791, at *12  (E.D. Pa. Jan. 25, 1996).  Indeed, the record reflects that Plaintiff has admitted that Curran's comments did not refer to Plaintiff's age.  On October 28, 2002, Jennifer Wood ("Wood"), a representative from Randstad's human resources department, contacted Plaintiff to discuss Plaintiff's allegations of harassment, including Curran's performance evaluation.  Wood testifies about the meeting with Plaintiff, noting: "When talking to [Plaintiff], her conversation was such that she ultimately said that her performance was not what it should be, and that all said and done, maybe she wasn't being discriminated against, maybe she was just having a hard time with Robin [Curran]."  (Brown Cert. Ex. E, Wood Dep. T:43).  Wood's notes from the meeting with Plaintiff supports this understanding.  Wood states: "I asked [Plaintiff] if she could help me understand if maybe something had been said that was direct - or implied - that [referred] to her age - she then said no - she just thinks that Robin [Curran] doesn't like her." (Brown Cert. Ex. A, Pl.'s Dep. Ex. 7).  Accordingly, the statements by Curran also fail to constitute direct evidence of age discrimination.

Next, the Court turns to Plaintiff's allegations that a negative performance review and her placement on the "Back on Track Plan" were motivated by age.  The events leading up to these actions, however, do not support a finding of discrimination based on age.  The record indicates that Brian Collins, the Market Manager who supervised Plaintiff immediately prior to Curran,

expressed some concern over Plaintiff's performance.   Upon being hiring, Curran met with

Collins to discuss the performance of the employees who would be reporting to Curran.  Collins

supervised Plaintiff from June 2000 to September 2000, and again from April 2001 to May 2001.

Collins advised Curran that Plaintiff "needed closer supervision."  (Brown Cert. Ex. C, Collins

Dep. T:28).  After becoming Plaintiff's supervisor, Curran began to receive complaints from

Plaintiff's co-workers concerning Plaintiff's alleged disruptive attitude and behavior in the

office.  (Id. Ex. B; Curran Dep. T:20-22).  By the spring of 2002, Curran observed that Plaintiff's

behavior "was beginning to become progressively worse."  (Curran Dep. T:26).  On June 18,

2002, Curran had a conversation with Plaintiff concerning Plaintiff's "self control" issues,

including allegedly raising her voice and throwing papers at other employees.  (Curran Dep.

T:22, 28).  Curran then met with Plaintiff on June 20, 2002, regarding complaints from other

agents that Plaintiff was allegedly improperly listing herself as a business contact for other

employees' clients.  (Curran Dep. T:28).  By the summer of 2002, Curran was documenting

Plaintiff's performance because, according to Curran, by then, Plaintiff's "performance and her

behavior was getting increasingly worse."  (Id. T:32).  On October 10, 2002, Plaintiff and Curran

conducted a sales meeting with a prospective client.  Although disputed by Plaintiff, Defendants

maintain that Plaintiff was not prepared for the meeting.  (Id. T:70).

On October 18, 2002, Plaintiff received a negative performance review.  In it, Curran

notes that "Plaintiff handles herself in my opinion very unprofessionally, many times with

outbursts and making inappropriate statements to her coworkers."  (Brown Cert. Ex. A, Pl.'s

Dep. Ex. 4).  Curran further states that Plaintiff's "behavior has created an environment where

trust amongst the team is no longer as strong as it should be," and that Plaintiff "has not

demonstrated to me a strong ability or desire to cooperate with her peers."  (Id.).   Further,

Curran notes that Plaintiff "will set goals but fails to meet objectives" and that Plaintiff "has not demonstrated a willingness to strategically capture business that is in line with market objectives."  (Id.).  On the same date, Plaintiff was advised that she was also placed on the "Back On Track Plan," which set forth a number of performance standards for Plaintiff to satisfy over an eight-week period.  (Brown Cert. Ex. A, Pl.'s Dep. Ex. 5).  Specific reasons cited for placement on the "Back on Track Plan" include, Plaintiff's failure to meet performance expectations as a BDM, "negative behavior," as well as "negative" and "inappropriate" comments in the workplace.  (Id.).  In view of all of the foregoing, this Court finds that Defendants have presented relevant record evidence supporting their actions.  Plaintiff, however, fails to raise a genuine issue of material fact that Defendants' actions in giving Plaintiff a negative performance review and placing her on the "Back on Track Plan," was motivated by age animus.

In addition, Plaintiff charges that Randstad's decision to require Plaintiff to give up her individual office and work from a desk in the common area of the branch office was connected to Plaintiff's age.  The record indicates that in October 2002, Randstad underwent a companywide reorganization which affected Randstad's organizational structure, including job titles and responsibilities.  Consequently, Randstad eliminated the BDM position, and transitioned numerous BDMs into Agent positions.  As part of this reorganization, Plaintiff was transferred to an Agent position.  According to Defendants, no Agents had offices and all Agents worked from desks in common areas of branch offices because, according to Defendants, this permitted the Agents to work more cohesively as a team.  (Curran Dep. T:86; Wood Dep. T:105-106).  As such, no reasonable trier of fact would conclude that Defendants' actions pertaining to Plaintiff's office constitute direct evidence of discrimination.

Finally, Plaintiff contends that Defendants' treatment towards Plaintiff in connection

were her unexcused absences commencing on about November 1, 2002, was also motivated by

age animus towards Plaintiff.  The Court initially notes that Defendants object to the

submissions, by Plaintiff, of a number of authenticated exhibits relating this incident.  Federal

Rule of Civil Procedure 56(c) provides that summary judgment is appropriate where "there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  The moving party must demonstrate that there are no material issues of fact.

Manetas v. Int'l Petroleum Carriers, 541 F.2d 408, 413 (3d Cir. 1976).  Thus, in ruling upon

summary judgment motion, courts can refuse to consider unauthenticated documents.

Silver-Krieger, Ltd. v. Nicon Warehouse, No. 89-39, 1986 WL 4311, *3 (D.N.J. April 2, 1986)

(citing Zenith Radio Corp. v. Matsushita Elec. Ind. Co., 505 F. Supp. 1125, 1139 (E.D. Pa.

1980)).  Here, Defendants correctly observe that various exhibits submitted by Plaintiff, namely,

the notes pertaining to Plaintiff's medical care (Panitch Cert. Ex. P), the November 8, 2002 letter

from Plaintiff's counsel advising that Plaintiff was under medical care (Panitch Cert. Ex. Q), and

the November 11, 2002 letter from Stacy Williams of Randstand's human resources department

to Plaintiff concerning medical documentation pertaining to Plaintiff's absences (Pantich Cert.

Ex. R), are all unauthenticated.  Even if the Court were to consider these unauthenticated

exhibits, it cannot be said that Plaintiff has created a triable issue of fact that Randstad's actions

in seeking medical documentation was motivated by age animus.  It is undisputed that Plaintiff

that Plaintiff stopped reporting to work on November 1, 2002, and left daily voicemail messages

with Curran advising that she was sick.  Williams has testified that it on November 8, 2002, she

saw the November 4, 2004 doctor's note excusing Plaintiff from work for two weeks.  (Woods

Dep. T:24).  Even if Randstad required further documentation by November 11, it cannot be said

that Randstad's efforts to secure proper medical documentation regarding concerning Plaintiff

absences was unreasonable in light of the circumstances of Plaintiff's absence from work for

approximately ten days.  A reasonable fact-finder would not find that Randstad's actions in this

regard were based on any age-based animus towards Plaintiff.

In sum, Plaintiff fails to provide any competent evidence that would lead a reasonable

trier of fact to believe that the allegations regarding Curran's comments, the negative

performance evaluations and placement on the "Back On Track Plan," and Defendants' decision

to transfer Plaintiff to a common area with other Agents, and Plaintiff's treatment after she

stopped reporting for work, was due to her age.  Accordingly, Defendant is entitled to summary

judgment on Plaintiff's hostile work environment claim under the NJLAD, as Plaintiff fails to

show that the conduct alleged would not have occurred but for her age.[5]

## B.    Age Discrimination under the NJLAD

In the First Count of her Complaint, Plaintiff appears to also assert a claim for age

discrimination pursuant to the NJLAD.[6]  Age discrimination claims under the NJLAD are

governed by the standards and burden of proof structure applicable to the Age Discrimination in

Employment Act, 29 U.S.C. § 621, et seq. ("ADEA").  Retter v. Georgia Gulf Corp., 755 F.

Supp. 637, 638 (D.N.J. 1991), aff'd, 975 F.2d 1551 (3d Cir. 1992); Giammario v. Trenton Bd. of

Educ., 203 N.J. Super. 356, 361 (App. Div. 1985), cert. denied, 102 N.J. 336 (1985); cert.

denied, 475 U.S. 1141 (1986).  The New Jersey Supreme Court has utilized the burden-shifting

---

[5]Because Plaintiff must prove all four elements of a hostile environment claim, the Court need
not address the merits of the other three elements of Plaintiff's hostile environment claim.

[6]Defendants maintain that Plaintiff's Complaint fails to assert a claims for age discrimination.
However, Plaintiff specifically alleges that: "Pursuant to the New Jersey Law Against
Discrimination, N.J.S.A. 1:5-1, et seq., defendants are liable for the acts constituting hostile
work environment and age discrimination directed at Plaintiff."  (Compl. ¶ 20).   As such, the
Court will consider the claim.

standard described by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973), "as a starting point" in analyzing claims under the LAD where the plaintiff does not

present direct evidence of discrimination.[7]  Bergen Commercial Bank v. Sisler, 157 N.J. 188,

210 (1999) (quoting Andersen v. Exxon Co., 89 N.J. 483, 492 (1982)).  First, a plaintiff must

demonstrate a prima facie case of discrimination, by a preponderance of the evidence.

McDonnell Douglas, 411 U.S. at 802.  A prima facie case creates a presumption of unlawful

discrimination.  Sisler, 157 N.J. at 210-11; Texas Dep't of Community Affairs v. Burdine, 450

U.S. 248, 253 (1981)).  The burden then shifts to the employer to articulate a legitimate,

nondiscriminatory reason for the adverse employment action.  St. Mary's Honor Center v. Hicks,

509 U.S. 502, 506-07 (1993); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d

Cir. 1995).  Once the employer meets its burden of producing evidence of a legitimate reason for

the adverse action, the burden then shifts back to the plaintiff to satisfy her ultimate burden of

proving that the employer's reasons were merely a pretext for age discrimination.  Hicks, 509

U.S. at 511; Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997).

A plaintiff may establish a prima facie case of age discrimination by demonstrating by a

preponderance of the evidence that he or she: (1) is a member of a protected class; (2) was

performing his job at a level that met his or her employer's legitimate expectations; (3) was

dismissed; and (4) was replaced by a sufficiently younger employee to give rise to an inference

of unlawful age discrimination.  Swider v. Ha-Lo Indus., Inc., 134 F. Supp. 2d 607, 621 (D.N.J.

2001) (citing Healy v. New York Life Ins. Co., 860 F.2d 1209, 1214 (3d Cir.1988), cert. denied,

490 U.S. 1098 (1989); Fischer v. Allied Signal Corp., 974 F. Supp. 797, 805 (D.N.J. 1997)); see

also Monaco v. American General Assurance Co., 359 F.3d 296, 399  (3d Cir. 2004) (finding

---

[7]Plaintiff herein admits that there is no direct evidence of discrimination.  (Pl.'s Br. in Opp. 6).

that Title VII and NJLAD contain similar requirements for satisfying the fourth element of the prima facie case, namely, that the defendant retained a sufficiently similar younger person to perform the plaintiff's position).  In the present case, Defendants do not dispute that Plaintiff is a member of a protected class, as she was fifty-nine at the time that her employment ended with Randstad.  Defendants do, however, contend that Plaintiff fails to introduce evidence in support of the remaining elements of the prima facie case.

With respect to the second prong of the prima facie case, Defendants maintain that Plaintiff was not performing at Randstad at a level that met management's expectations.  In order to meet this requirement, a plaintiff "must show that he was performing his job satisfactorily."  Swider, 134 F. Supp. 2d at 622.  Turning to the facts of record, it appears that Plaintiff was not performing to management's expectations.  Curran has testified that after becoming Plaintiff's supervisor, she began to receive complaints from Plaintiff's coworkers regarding Plaintiff's behavior and attitude towards coworkers.  (Curran Dep. T:20-21, 24).  Further, Curran observed that by the spring of 2002, Plaintiff's behavior was "beginning to become progressively worse."  (Id. T:26).  Consequently, in June of 2002, it is undisputed that Curran had a conversation with Plaintiff concerning Plaintiff's "self control" issues.  (Id. T:28).  Additionally, another Market Manager, Anthony Castellucci, has testified that Plaintiff made an alleged discriminatory comment concerning another Randstad employee.  (Castellucci Dep. T:36).  It is also uncontroverted that Castellucci reported the alleged incident to Curran.  (Curran Dep. T:73-74).

That same month, Plaintiff received her annual performance review.  The October 18, 2002 evaluation addressed a variety of topics relating to employee performance.  The annual review incorporated the following rating system: a rating of "O" signifies "outstanding" abilities

and performance; "AC" stands for "acceptable" performance; an "AP" rating means that the employee "needs improvement" in the area at issue; and, a rating of "UC" stands for "unacceptable" performance.  (Brown Cert. Ex. A, Pl.'s Dep. Ex. 4).  Plaintiff received a rating of "UC," or "unacceptable," in eleven of the twelve areas addressed in the October 2002 performance review.  (Id.).  Plaintiff received a rating of "AP," or "needs improvement," as to the remaining area.  (Id.).

The person completing the annual performance review could also provide comments, in addition to the ratings discussed above.  Curran's comments regarding Plaintiff's behavior and attitude at work reflected some of the asserted behavioral issues already mentioned.  Curran states, for instance: "[Plaintiff] handles herself in my opinion very unprofessionally, many times with outbursts and making inappropriate statements to her coworkers."  (Brown Cert. Ex. A, Pl.'s Dep. Ex. 4).  Curran further notes that Plaintiff's "behavior has created an environment where trust amongst the team is no longer as strong as it should be," and that Plaintiff has not demonstrated "a strong ability or desire to cooperate with her peers."  (Id.).  It is also noted that Plaintiff "made an inappropriate statement that should not have been made in the work place." (Id.). The comments regarding Plaintiff's job performance were equally unfavorable.  In the areas of management and accountability, Curran notes that Plaintiff "will set goals but fails to meet objectives" and that Plaintiff "has not demonstrated a willingness to strategically capture business that is in line with market objectives."  (Id.).  It is further noted that Plaintiff "lacks follow through and results," and that she fails to "demonstrate[] a willingness to strategically capture business that is in line with the market's objectives."  (Id.)

Based upon these facts, and given the testimony of record of the various Randstad employees, Plaintiff fails to raise a genuine issue of fact as to whether she was performing her

job functions adequately enough to meet Randstad's legitimate expectations.  Plaintiff cannot

demonstrate that she was qualified for the Agent position, in light of the record evidence relating

to Plaintiff's asserted behavioral issues and performance issues.  As such, Plaintiff fails to meet

her burden of establishing a prima facie case of age discrimination under the NJLAD.[8]

Therefore, Defendants are entitled to summary judgment with respect to this claim.

Even assuming, arguendo that Plaintiff satisfied her burden to establish a prima facie

case, Defendants have set forth legitimate, non-discriminatory reasons for the negative

performance review and placement on the "Back on Track Plan."  The record supports

Defendants' assertion of instances of unprofessional and inappropriate behavior by Plaintiff

towards coworkers, as well as issues relating to Plaintiff's performance on the job.  As such, it

cannot be said that Defendants' employment decisions pertaining to the negative performance

evaluation and placement on the performance improvement plan, were not legitimate, non-

discriminatory actions.  Furthermore, Plaintiff fails to point to any evidence to show that the

reasons for Defendants' employment decisions were pretext for discrimination.  Defendants are

therefore entitled to summary judgment on Plaintiff's age discrimination claims.

**C.      Retaliation Claim Under the NJLAD**

New Jersey law makes it is unlawful for "any person to take reprisals against any person

because that person has opposed any practices or acts forbidden under [the NJLAD.]"  N.J.S.A.

10:5-12(d).  To establish a prima facie case of retaliation under the NJLAD, a plaintiff must

show that the: "(1) claimant engaged in a protected activity known to the employer, (2) claimant

---

[8]It also appears that Plaintiff cannot show that Randstad retained someone sufficiently younger in Plaintiff's position to give rise to unlawful age discrimination, see Swider, 134 F. Supp. 2d at 621, as Plaintiff offers no evidence regarding a replacement.  Plaintiff therefore also fails to satisfy the fourth prong of the prima facie case.  Accordingly, the Court need to reach the issue of whether Plaintiff was discharged.

thereafter was subjected to adverse employment decision by the employer, and (3) there was a causal link between the two." Jamison v. Rockaway Tp. Bd. of Educ., 242 N.J. Super. 436, 445 (App. Div. 1990) (citation omitted).  See also Ferraro v. Bell Atlantic Co., Inc., 2 F. Supp. 2d 577 (D.N.J. 1998).  Once a plaintiff establishes a prima facie case of retaliation, the defendant must "articulate a legitimate, non-retaliatory reason for the decision." Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 549 (App. Div. 1995) (citation omitted).  Next, "the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." Ibid.  Defendants herein contend that Plaintiff's retaliation claim fails because Plaintiff cannot meet the second and third elements of the prima facie case.

It is clear at the outset that Plaintiff fails to satisfy the causation prong of the prima facie case.  First, the Court notes that Plaintiff provides only partial opposition to Defendants' motion on her retaliation claim.  (Pl.'s Br. in Opp. 14-15).  Plaintiff, however, does not respond to Defendants' arguments on causation in her responsive brief, and, as such, Defendants' arguments are deemed unopposed.  In the Third Circuit, courts have routinely held the claim at issue to have been abandoned, if not "defended in [its] opposition to defendant's motion." Evans v. Nine West Group, Inc., No. 00-4850, 2002 WL 550477, at *4 (E.D. Pa. April 15, 2002); see also Damiano v. Sony Music Entm't, Inc., 975 F. Supp. 623, 627 (D.N.J. 1996) (granting summary judgment on plaintiff's copyright infringement claim on the basis that the motion was considered unopposed); U.S. v. Rohm & Haas Co., 939 F. Supp. 1157, 1161 (D.N.J. 1996) (granting summary judgment on basis that plaintiff's argument was unopposed, and thus no genuine issue of material fact was created).  As such, Defendants' motion as to this claim can be granted solely on procedural grounds, for failure to satisfy causation.

It is also clear that Defendants are entitled to summary judgment on the merits.  The record indicates that on October 22, 2002, Plaintiff made an internal complaint by email to Randstad's human resources department.  (Defs.' Resp. to Pl.'s Counterstatement ¶ 7).  In her responsive brief, Plaintiff alleges the following adverse employment actions: removal from her individual office,  placement on the "Back On Track Plan," and constructive discharge.  (Pl.'s Br. in Opp. 14).  The first two alleged retaliatory acts do not satisfy the causation requirement because they occurred on or before October 18, 2002 – several days <u>prior</u> to Plaintiff's internal complaint on October 22, 2002.  <u>Overall v. The Univ. of Penn.</u>, No. 02-1628, 2003 U.S. Dist. LEXIS 23892, *27-28 (E.D. Pa. 2003) (concluding that summary judgment was appropriate on a retaliation claim based on a failure to satisfy the causation requirement).  Furthermore, the final alleged retaliatory action, Plaintiff's claim of constructive discharge, also fails, for all the reasons discussed more fully, <u>infra</u>.  Plaintiff, therefore, fails to meet her burden to establish a casual link between her complaint to human resources and the alleged adverse actions. Plaintiff's <u>prima facie</u> case of retaliation is therefore not established.[9]  Accordingly, Defendants' motion for summary judgment as to Plaintiff's NJLAD retaliation claims is granted.[10]

## D.    Constructive Discharge

Defendants contend that Plaintiff never properly pled a claim for constructive discharge, and accordingly, any such claim now asserted by Plaintiff should be dismissed.  The Court notes that none of the five causes of action contained in Plaintiff's Complaint include constructive

---

[9]The Court need not reach the issue of whether the alleged retaliatory acts constituted adverse employment actions, given Plaintiff's failure to meet the causation requirement on both procedural and substantive grounds.

[10]Even if the <u>prima facie</u> case was met, Defendants offer a legitimate, non-retaliatory explanation for their actions and Plaintiff fails to show that the offered reasons are pretextual.  Therefore, the retaliation claim would nevertheless fail.

discharge.  There is, nonetheless, included in the factual background portion of the Complaint, a sole allegation that Plaintiff was constructively discharged from Randstad on November 27, 2002.  (Compl. ¶ 17).  It cannot be said, however, that this vague and conclusory sole allegation to constructive discharge provides Defendants with fair notice of such a claim and, therefore, fails to state a claim against Defendants.  Bieros v. Nicola, 860 F. Supp. 226, 229 (E.D. Pa. 1994); see also Duncan v. AT & T Communications, 668 F. Supp. 232, 234 (S.D.N.Y. 1987) ("[I]ndividual allegations, although grammatically intact, may be so baldly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains. Such allegations are meaningless as a practical matter and, as a matter of law, insufficient to state a claim.").  Accordingly, to the extent that Plaintiff now asserts a cause of action for constructive discharge, the claim can be dismissed on procedural grounds.

Moreover, Defendants would nevertheless still be entitled to summary judgment on the merits of a constructive discharge claim.  Generally, a plaintiff seeking to establish a constructive discharge claim under the LAD must first establish a violation of the NJLAD or a public policy before he or she can maintain a claim for constructive discharge .  Warren v. Home Depot U.S.A., Inc., 2006 WL 2085385, at *4 (App. Div. July 28, 2006).  In addition, the plaintiff must prove that an "'employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'"  Muench v. Township of Haddon, 255 N.J. Super. 288, 302 (App. Div. 1992) (quoting Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984)).  This "standard envisions a 'sense of outrageous, coercive and unconscionable requirements.'"  Shephard v. Hunterdon Developmental Center, 174 N.J. 1, 28 (2002) (quoting Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428 (App. Div. 2001)). For the reasons already discussed, Plaintiff fails to establish a violation of the NJLAD.

Accordingly, summary judgement is granted inasmuch as Plaintiff now asserts a separate claim for constructive discharge.[11]

**E.      Aiding and Abetting Under the NJLAD**

Plaintiff alleges that Defendants aided and abetted each other by engaging in discriminatory and retaliatory conduct against Plaintiff.  (Compl. ¶¶ 32-35).  The NJLAD makes it an "unlawful discrimination practice ... for any person, whether an employer or employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."  N.J.S.A. 10:5-12(e).  Although an employee cannot be held individually liable, employers and individual supervisors can be held liable under the NJLAD for aiding and abetting another's discriminatory conduct."  Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 126 (3d Cir. 1999).  However, an individual employee can only be found liable of aiding and abetting if "actively involved in the discriminatory conduct."  Jones v. Jersey City Med. Center, 20 F. Supp. 2d 770, 774 (D.N.J. 1998) (citing Tyson v. CIGNA, 918 F. Supp. 836, 841 (D.N.J. 1996)).  In Hurley, the Third Circuit explained that liability for aiding and abetting under the NJLAD involves three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."  174 F.3d at 127 (citations omitted).

In the present case, Defendants argue that Plaintiff's aiding and abetting claim fails because Plaintiff is unable to present questions of fact on the underlying harassment and

---

[11]Moreover, it should be noted that Defendants' motion for summary judgment with respect to the constructive discharge claim is unopposed.  As such, the claim is deemed abandoned.  Evans, 2002 WL 550477, at *4; Damiano, 975 F. Supp. at 627.

retaliations claims.  This Court agrees.  As already discussed, Defendants are entitled to summary judgment on Plaintiff's NJLAD discrimination and retaliation claims.  It follows, therefore, that Plaintiff's aiding and abetting claim must also fail.  Monaco, 359 F.3d at 307 n. 15 ("[I]nasmuch as we hold that the district court correctly granted summary judgment to the corporate defendants, any claim he brought against the individual defendants for aiding and abetting fails as well."); Jackson v. Del. River & Bay Auth., No. 99-3185, 2001 WL 1689880, at *22 (D.N.J. Nov. 26, 2001) ("If the NJLAD does not apply to the employer [], then no individual aiding and abetting liability may be found, because an employer's liability must be shown before any supervisory liability for violations can exist.").  Accordingly, the Court hereby dismisses the Third Count of Plaintiff's Complaint, which asserts that Defendants aided and abetted in a NJLAD violation.

**F.      Jane Does and John Does**

The Court notes that discovery has concluded in this matter, and Plaintiff has failed to identify or move to substitute anyone for the John Doe and Jane Doe Defendants.  Therefore, those claims are dismissed.

## CONCLUSION

For the reasons set forth above, Defendants motion for summary judgment [Docket # 30] is GRANTED as against Plaintiff Roberta Feraro-Bengle.

An appropriate order follows.


DATED: August 29, 2006                                    s/ Jose L. Linares_____
                                                         United States District Judge